USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9__|__19__|__18__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARTER COMMUNICATIONS, INC.,

Plaintiff,

- against -

LOCAL UNION NO. 3, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO, LANCE VAN
ARSDALE, in his capacity as Assistant
Business Manager, Maintenance Division of
Local No. 3, DEREK JORDAN, in his
capacity as Business Representative of Local
No. 3, SEAN FITZPATRICK, in his capacity
as Business Representative of Local No. 3,
and "JOHN DOES" (names being fictitious,
all of whom are unknown to plaintiff, all of
persons being members of or acting in
concert with IBEW Local No. 3),

Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 2471 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Charter Communications, Inc. ("Charter") seeks leave to file a Third

Amended Complaint ("TAC") against Local 3 of the International Brotherhood of Electrical

Workers, AFL-CIO (the "Union"), asserting a claim under Section 303 of the Labor Management

Relations Act ("LMRA"), 29 U.S.C. § 187, for "unlawful secondary boycotting." (See Mot. to

Amend (Dkt. No. 66); TAC (Dkt. No. 66-1) ¶¶ 1-3, 6, 33-40) During collective bargaining

negotiations, the Union proposed a change to the subcontracting provision of the collective

bargaining agreement ("CBA"), under which Plaintiff would only be permitted to subcontract

work to companies "paying wages and benefits identical to" the wages and benefits provided

under the CBA. (TAC (Dkt. No. 66-1) ¶¶ 14-17) Plaintiff alleges that the Union's

subcontracting proposal constitutes an unlawful union signatory clause, and that the Union's

subsequent strike "in support of that demand" is an "unfair labor practice" in violation of Section 303 of the LMRA. (See id. ¶¶ 16-20, 22, 33-40)

On October 10, 2017, this Court granted Defendants' motion to dismiss the Second Amended Complaint ("SAC").[1] (Order (Dkt. No. 61)) This Court held that the SAC failed to state a claim under LMRA Section 303 because it did not "plausibly allege that the Union was insisting on an unlawful union signatory clause," and the Court declined to exercise supplemental jurisdiction over Plaintiff's remaining claim against the Union and several Union representatives under Section 807 of the New York Labor Law ("NYLL"). (Oct. 10, 2017 Tr. (Dkt. No. 64) at 9:20-22, 13:22-14:19)[2]

Pending before the Court is Plaintiff's motion for leave to file a Third Amended Complaint (TAC"). (See Mot. (Dkt. No. 66); TAC (Dkt. No. 66-1)) The proposed TAC pleads only an LMRA Section 303 claim against the Union.

The Union contends that Charter's motion to amend should be denied, because: (1) Charter has not demonstrated "good cause" for its untimely amendment; and (2) the proposed amendment would be futile. (Def. Br. (Dkt. No. 68))

For the reasons stated below, Plaintiff's motion for leave to file a Third Amended Complaint will be denied.

---

[1] Familiarity with the Court's October 10, 2017 bench ruling is presumed. (See Oct. 10, 2017 Tr. (Dkt. No. 64))

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

## I.    FACTS

Plaintiff Charter offers cable, Internet, and phone services to residential, commercial and governmental subscribers. (TAC (Dkt. No. 66-1) ¶ 6) Defendant is Local 3 of the International Brotherhood of Electrical Workers. (Id. at 1) The Union represents 1,700 cable technicians who work for Charter. (Id. ¶ 9)

---

[3] The following facts are drawn from the proposed TAC and are presumed true for purposes of resolving whether Charter's motion to amend would be futile. See Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., No. 08 Civ. 1533 (BSJ) (JCF), 2011 WL 1142916, at *4 (S.D.N.Y. Mar. 22, 2011); see also Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). "Because determinations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6), '[f]utility is generally adjudicated without resort to any . . . evidence [outside the face of the complaint].'" Gary Friedrich Enterprises, LLC, 2011 WL 1142916, at *4 (quoting Wingate v. Gives, No. 05 Civ. 1872 (LAK) (DF), 2009 WL 424359, at *5 (S.D.N.Y. Feb. 13, 2009)). The Court may properly consider documents attached to the complaint as exhibits, incorporated by reference, or integral to the Complaint, however. See, e.g., Max Impact, LLC v. Sherwood Grp., Inc., No. 09 Civ. 902 (LMM) (HBP), 2012 WL 3831535, at *4 (S.D.N.Y. Aug. 16, 2012) ("[I]n making futility determinations, the court must limit itself to the allegations in the complaint, as well as to any documents attached to the complaint as exhibits or incorporated by reference." (citations omitted)); see also Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir. 2012). Accordingly, in resolving Plaintiff's motion, the Court has considered documents that are incorporated by reference in the proposed TAC, such as the Union's March 26, 2017 proposal regarding "identical" wages and benefits, and the Union's revised March 31, 2017 proposal. (See TAC (Dkt. No. 66-1) ¶ 22; Van Arsdale Decl., Ex. F (Mar. 31, 2017 Proposal) (Dkt. No. 37-6)). The Court has also taken judicial notice of public filings in proceedings brought by Charter before the National Labor Relations Board ("NLRB"), including Charter's unfair labor practice charge and the NLRB's letter approving Charter's withdrawal of this charge. (See Van Arsdale Decl., Ex. E (Mar. 28, 2017 NLRB charge) (Dkt. No. 37-5); Van Arsdale Decl., Ex. G (Withdrawal of Charge) (Dkt. No. 37-7)); Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006) ("'[In deciding a motion to dismiss,] [a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)); Jermaine Dunham v. City of New York, et al., No. 11 Civ. 1223 (ALC) (HBP), 2018 WL 1305460, at *5 (S.D.N.Y. Mar. 13, 2018) (noting that, as with a motion to dismiss, a court can "consider matters of which judicial notice may be taken" in ruling on whether a proposed amendment would be futile).

The CBA between Charter and the Union has expired (see id. ¶ 23), and Charter and the Union have been engaged in negotiations regarding a new CBA since February 6, 2017. (Id. ¶ 13) Kevin Smith – Charter's Group Vice President of Labor and Employee Relations – has acted as Charter's chief representative in the negotiations, while Derek Jordan and Lance Van Arsdale have represented the Union. (Id.)

## A. The Union's March 26, 2017 Proposed Revision to the Subcontracting Provision

On March 26, 2017, the Union submitted forty-four proposed revisions to the CBA. (Id. ¶¶ 14, 16) Among the proposed revisions was a change to Section 7 of the CBA, which addresses the subcontracting of work. (Id. ¶¶ 14-15) The previous CBAs between Charter and the Union contained the following subcontracting provision:

SECTION 7 - SUBCONTRACTING AND CONTRACTING OUT WORK

A. The Company shall have the right to enter into sub-contracts of the work referred to in Section 6 of this Agreement with companies paying wages and benefits <u>similar to this Agreement</u> and providing such sub-contracting is not done for the purpose of laying off employees.

(Id. ¶ 15 (emphasis added))

The Union's March 26, 2017 proposal states: "Section 7A – DELETE 'SIMILAR TO THIS AGREEMENT' AND ADD 'IDENTICAL TO THIS AGREEMENT.'" (Id. ¶ 16) (emphasis in original) If the Union's proposal were adopted, Section 7A of the CBA would read as follows:

SECTION 7 – SUBCONTRACTING AND CONTRACTING OUT WORK

A. The Company shall have the right to enter into sub-contracts of the work referred to in Section 6 of this Agreement with companies paying wages and benefits <u>identical to this Agreement</u> and providing such sub-contracting is not done for the purpose of laying off employees.

(Id. ¶ 17 (emphasis in original))

After the Union submitted its proposed revisions, Charter asked Van Arsdale to explain the meaning of the new language in Section 7 of the CBA. (Id.) Van Arsdale responded that the new language "'means that you can only subcontract with contractors that have this agreement.'" (Id.) Charter then asked whether the proposed language meant that Charter could only subcontract "with 'Local 3 contractors.'" (Id.) Van Arsdale responded: "'No; I'm saying you can only contract with contractors with the same agreement.'" (Id. (emphasis omitted))

Charter rejected several of the Union's proposed revisions, including the subcontracting proposal. (Id. ¶ 19) In response, Van Arsdale "cut off" the March 26 negotiation session, stating: "'[t]he foremen are a strike issue, the JIB [benefits plans] is a strike issue and subcontracting is a strike issue. We are done for the day.'" (Id. (emphasis omitted))

On March 28, 2017, the Union went on strike, and "well over 1,000 [Charter] employees . . . engaged in a work stoppage . . . in support of [the Union's] bargaining demands." (Id. ¶ 20) The strike has continued to date, with hundreds of Charter employees picketing outside of Charter's facilities in New York City and northern New Jersey. (Id. ¶¶ 20-21)

On March 28, 2017, Charter filed an unfair labor practice charge with the National Labor Relations Board. (See Van Arsdale Decl., Ex. E (Mar. 28, 2017 NLRB charge) (Dkt. No. 37-5) at 2) Charter alleged that the Union was violating Section 8(b)(4)(A) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(A), by engaging in a strike with the "object of forcing or requiring" Charter to agree to an unlawful union signatory clause prohibited by Section 8(e) of the NLRA. (See id.)

**B.      The Union's March 31, 2017 Revised Proposal**

In a March 31, 2017 email to Smith, Union representative Derek Jordan addressed the Union's proposed revision regarding subcontracting:

5

Kevin -- It has come to our attention that Time Warner Cable/Charter Spectrum has misconstrued and mischaracterized our proposal concerning Section 7A of the 2009-2013 CBA, our proposal No. 35. For the avoidance of any misunderstanding and to ensure as best we can that you understand our proposal as given across the table in these negotiations, we replace our written proposal No. 35 with the following:

35) SECTION 7A - DELETE AND REPLACE: The Company shall have the right to enter into sub-contracts of the work referred to in Section 6 of this Agreement with companies paying wages and benefits for such work at least identical in cost to this Agreement, the amount of which to be paid to employees by direct payment in their paycheck or by separate check, or alternatively, only with respect to benefits provided for under Sections 17-18 and 20-21 of this Agreement, by employee benefit contributions on behalf of employees performing such work in an amount at least at the rate provided for in those Sections of this Agreement, and paid to one or more bona fide employee benefit plans, and providing such sub-contracting is not done for the purpose of laying off employees working under this Agreement.

Please let us know if you wish to discuss this or any other bargaining issue.

Derek

(See Van Arsdale Decl., Ex. F (Mar. 31, 2017 email) (Dkt. No. 37-6) at 2 (emphasis added); TAC

(Dkt. No. 66-1) ¶ 22)[4] Charter claims that the Union tendered this revised proposal "for the

ostensible purpose of curing the illegality of [its] March 26 proposal." (TAC (Dkt. No. 66-1) ¶

22)

---

[4] Charter does not contend that the Union's revised proposal constitutes an unlawful union signatory clause. Accordingly, if this action were to proceed, any damages stemming from the Union's allegedly unlawful March 26, 2017 proposal would likely be limited to the three-day period during which the Union went on strike and the Union tendered its new proposal – March 28, 2017 through March 31, 2017. See Feather v. United Mine Workers of Am., 903 F.2d 961, 967 (3d Cir. 1990) ("When 'the unlawful purpose of the strike [is] effectively abandoned[]'. . . the union is not liable for damages caused by the strike thereafter. Capping liability at the point when the unlawful purpose is effectively abandoned encourages settlement of labor disputes, and also comports with 'the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.'" (quoting Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 623 F.2d 1354, 1363 (9th Cir. 1980); N.L.R.B. v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692 (1951)).

Charter subsequently withdrew its NLRB charge, and the NLRB case was closed on April 3, 2017. (See Van Arsdale Decl., Ex. G (Apr. 3, 2017 NLRB Letter Approving Withdrawal Request) (Dkt. No. 37-3) at 2; Charter Communications, Inc., N.L.R.B. Case No. 02-CC-195746, https://www.nlrb.gov/case/02-CC-195746) On April 6, 2017, Charter filed the instant case. (See Cmplt. (Dkt. No. 1))

## C.      Wages and Benefits "Identical To This Agreement"

Charter contends that the Union's March 26, 2017 proposal constitutes an unlawful union signatory clause under Section 8(e) of the NLRA, 29 U.S.C. § 158(e). (See TAC (Dkt. No. 66-1) ¶¶ 36-39) According to Charter, the proposal's requirement that Charter subcontract only "with companies paying wages and benefits identical to this Agreement" is "tantamount to [a requirement] that Charter enter into subcontracts only with companies that have collective bargaining agreements [with the Union]." (Id. ¶¶ 23(d)-(e), 26, 31 (emphasis in original)).

Employee benefits under the parties' now-expired CBA are provided exclusively by one of five benefit funds (the "Funds"), which are maintained as "jointly-trusteed employee benefit fund[s] within the meaning of Section 302 of the LMRA, 29 U.S.C. § 186 (commonly referred to as the Taft-Hartley Act)." (Id. ¶ 23(a)) Each of the Funds are sponsored by "[a]n equal number of union trustees appointed by Local 3 and management trustees appointed by the New York Electrical Contractors Association, Inc., the Association of Electrical Contractors, Inc. and other employers which are parties to collective bargaining agreements with Local 3." (Id. ¶ 23(b))

The Joint Industry Board of the Electrical Industry (the "JIB") "'administers all the plans and benefits that are collectively bargained between Local Union No. 3 . . . and the

employer contractors of New York.'" (Id. ¶ 23(c) (emphasis omitted)). The Funds are financed

from contributions of employers that have CBAs with the Union, and are collected by the JIB on

behalf of each of the Funds. (Id. ¶ 23(d)) The benefits administered by the JIB "are [therefore]

available only to electrical workers covered by a [CBA] between their employer and [the

Union]." (Id. ¶ 23(e))

The Funds are also "multiemployer plans" under the Employee Retirement

Income Security Act ("ERISA"), "which means that they are established pursuant to one or more

collective bargaining agreements." (Id. ¶ 24) According to Charter, it is not possible to provide

"'[b]enefits identical to [the CBA with the Union],' as demanded by [the Union] . . . except under

a multiemployer plan," because multiemployer plans and single employer plans are subject to

different statutory and regulatory provisions. (Id. ¶ 25) A requirement that any Charter

subcontractor provide "benefits identical to this Agreement" is thus equivalent to requiring

Charter to enter into subcontracts only with companies that participate in the JIB or

multiemployer plans. (Id. ¶ 26 (internal quotation marks omitted)) According to Charter,

because multiemployer plans must be established pursuant to a CBA, the requirement of

"identical" benefits effectively requires Charter to enter into contracts only with companies that

have CBAs. (Id.)

Several of the benefit plans "administered by the JIB provide, inter alia, networks

of health care benefit providers that are specific to these plans and cannot necessarily be

duplicated." (Id. ¶ 27)

Under the parties' now-expired CBA, Charter was required to make certain

contributions to the Funds. (Id. ¶ 28) The trustees of the JIB have discretion to allocate such

employer contributions "toward the provision of pension and medical benefits." (Id. ¶ 29)

Subcontractors that are not a party to a CBA with the Union are not able to participate in the JIB's pension or medical plan. (Id. ¶ 30) As a result, the pension and medical benefits provided by non-Union contractors do not involve the same "'pooled' arrangement," under which JIB trustees determine how employer contributions will be allocated. (Id.) The benefit plans provided by non-Union contractors would thus not be "identical" to those provided under the CBA. (See id.)

Moreover, because the pension and medical benefits provided by the JIB are determined by, and within the discretion of, the JIB trustees and are subject to change, "any contractor not a party to a collective bargaining agreement with Local 3 and therefore not a contributing employer to the JIB Pension/Medical Plan would have no way of ascertaining what pension and medical benefits the JIB Pension/Medical Plan provides at a particular time and therefore [could not] provide 'identical' benefits at all times." (Id. ¶ 31)

Charter also asserts that

[t]he JIB Pension/Medical Plan Board's considers itself to be a "grandfathered" plan for purposes of the Patient Protection and Affordable Care Act (the "Affordable Care Act). . . . A grandfathered plan is one that was established prior to March 23, 2010, and that has been maintained with limited changes. The grandfathering rules permit a plan to provide lesser benefits than those required under the Affordable Care Act. The "identical benefits" requirement in [the Union's March 26, 2017 proposal] can only be complied with by a contractor who has a grandfathered plan that already offers the "identical benefits provided by the JIB, which as discussed above is not possible except for a contractor who is a signatory to a bargaining agreement with [the Union].

(Id. ¶ 32)

Because the requirement of "identical" benefits allegedly "prohibit[s] Charter from doing business with contractors wh[o] are not a party to a collective bargaining agreement with [the Union,]" Charter contends that the Union's proposed subcontracting provision is unlawful under Section 8(e) of the NLRA. (Id. ¶¶ 36, 38) Charter further contends that by

9

"striking in support of that demand," the Union engaged in an "unfair labor practice" under Section 8(b)(4)(A) of the NLRA and violated LMRA Section 303. (See id. ¶¶ 33-35, 37)

## II.    PROCEDURAL HISTORY

The Complaint was filed on April 6, 2017, and asserted an LMRA Section 303 claim against the Union. (See Cmplt. (Dkt. No. 1)) Plaintiff alleged that the Union's March 26, 2017 subcontracting proposal was unlawful under Section 8(e), and that the Union's strike to compel Plaintiff to agree to this clause constituted an "unfair labor practice" under Section 8(b)(4) of the NLRA. (Id. ¶¶ 1, 15-20)

On June 12, 2017, Plaintiff filed an Amended Complaint that adds a claim for injunctive relief under NYLL § 807 against the Union and several Union representatives (collectively "Defendants"). (See Am. Cmplt. (Dkt. No. 16) ¶¶ 51-56) On July 19, 2017, Plaintiff filed the SAC, which elaborates on the allegations underlying Plaintiff's state law claim for injunctive relief. (See SAC (Dkt. No. 27) ¶¶ 22-56, 63-68)

Defendants subsequently requested leave to file a motion to dismiss, and on July 21, 2017, this Court set a briefing schedule concerning Defendants' proposed motion. (See Order (Dkt. No. 28)) The Court also instructed the parties to submit letters addressing whether discovery should be stayed pending resolution of Defendants' motion to dismiss. (Id. at 1)

In a July 27, 2017 letter, Defendants requested that discovery be stayed pending disposition of their motion to dismiss. (See July 27, 2017 Def. Ltr. (Dkt. No. 29) at 1) Plaintiff opposed Defendants' request for a stay of discovery. (See Aug. 1, 2017 Pltf. Ltr. (Dkt. No. 30)) After reviewing the parties' submissions, this Court denied Defendants' request for a stay of discovery (Order (Dkt. No. 31)), and on August 8, 2017, this Court entered a Civil Case Management Plan and Scheduling Order (the "CMP"). (CMP (Dkt. No. 33)) The CMP states

10

that, "[e]xcept for good cause shown, any motion to amend pleadings must be filed within 30 days from the date of this Order" – i.e., by September 7, 2017. (See id. ¶ 3) As of September 15, 2017, Defendants' motion to dismiss was fully briefed. (See Dkt. Nos. 36-41)

On October 2, 2017, Plaintiff moved by order to show cause for a temporary restraining order and a preliminary injunction. (See Order to Show Cause (Dkt. No. 42)) Plaintiff also sought leave to file a proposed Third Amended Complaint that included new allegations in support of Plaintiff's NYLL claim for injunctive relief. (See Pltf. Br. in Supp. of TAC (Dkt. No. 44) at 1; Proposed TAC (Dkt. No. 44) ¶¶ 22-98) The proposed TAC did not contain any substantive changes to Plaintiff's LMRA Section 303 claim. (See Proposed TAC (Dkt. No. 44) ¶¶ 14-21, 93-98)

## A. The Court's October 10, 2017 Bench Ruling

At an October 10, 2017 hearing concerning Plaintiff's application for a temporary restraining order and preliminary injunction, this Court (1) granted Defendants' motion to dismiss the SAC; (2) denied Plaintiff's motion for leave to file the proposed TAC; and (3) denied Plaintiff's motion for a temporary restraining order and preliminary injunction. (See Order (Dkt. No. 61); Oct. 10, 2017 Tr. (Dkt. No. 64) at 19:20-23)

With respect to Defendants' motion to dismiss the SAC, this Court held that the SAC did not plead sufficient facts to "plausibly demonstrate that the Union . . . violate[d] Section 8(e)" of the NLRA. (Oct. 10, 2017 Tr. (Dkt. No. 64) at 9:20-22) As an initial matter, the Court noted that the SAC did not even disclose Charter's response to the Union's March 26, 2017 proposal – "[i]n other words, Charter doesn't actually plead that it rejected the Union's proposal." (Id. at 10:8-11) More importantly, the SAC did not "plead facts explaining how the

11

Union's request that subcontractors pay 'identical' wages and benefits constitutes a demand for an unlawful union signatory clause." (Id. at 10:11-15)

The Court acknowledged that – in several letters and briefs submitted in connection with the pending motions – Plaintiff explained that the JIB is responsible for providing pension and medical benefits under the CBA, and that the JIB only provides such benefits to employees of companies that are signatories to CBAs with the Union. (See id. at 10:16-11:3; Pltf. Br. (Dkt. No. 39) at 15; May 2, 2017 Pltf. Ltr. (Dkt. No. 9) at 2-3; July 27, 2017 Pltf. Ltr. (Dkt. No. 29) at 3) Charter also explained that the requirement of "identical" benefits meant that it could only retain subcontractors that are signatories to CBAs with the Union. (See Oct. 10, 2017 Tr. (Dkt. No. 64) at 10:24-11:3) These explanations were not pled in the SAC, however, and the Court noted that a party cannot supplement its complaint with assertions made in subsequent letters or briefs. (See id. at 11:4-16) Accordingly, the Court declined to consider the supplementary factual allegations set forth in Charter's letters and briefs. (Id.)

The Court concluded that the SAC did not plausibly allege that the Union had insisted on an unlawful union signatory clause. (Id. at 13:22-25) The SAC therefore failed to state a claim under LMRA Section 303. (See id.) Moreover, because no federal claim remained, this Court declined to exercise supplemental jurisdiction over Plaintiff's NYLL claim. (Id. at 14:3-19) This Court therefore granted Defendants' motion to dismiss the SAC. (See id. at 13:22-14:19)

This Court also denied Plaintiff's motion for leave to file the proposed TAC, because the newly added allegations in the proposed TAC addressed only Plaintiff's NYLL claim. (Id. at 13:24-14:2; see also Proposed TAC (Dkt. No. 44)) Because the proposed TAC did

not remedy the defects in the SAC, the proposed amendment would be futile. (Oct. 10, 2017 Tr. (Dkt. No. 64) at 13:24-14:2)

At the close of the hearing, this Court directed Plaintiff to submit a letter stating how it wished to proceed in light of the Court's ruling. (Id. at 19:24-20:1) In an October 15, 2017 letter, Plaintiff stated that it intended to move for leave to file a "revised Third Amended Complaint." (Oct. 15, 2017 Pltf. Ltr. (Dkt. No. 62) at 1)

### B.    Plaintiff's Motion for Leave to File a Third Amended Complaint

The revised proposed TAC asserts only an LMRA Section 303 claim against the Union. (See TAC (Dkt. No. 66-1) ¶¶ 33-40) Plaintiff contends that leave to amend should be granted because the TAC "entirely cures" the deficiencies this Court identified in the SAC. (Pltf. Br. (Dkt. No. 67) at 4) The proposed TAC now expressly pleads that Plaintiff rejected the Union's March 26, 2017 subcontracting proposal (see TAC (Dkt. No. 66-1) ¶ 19), and includes factual allegations explaining how the proposal's requirement of "identical" benefits renders the subcontracting provision an unlawful union signatory clause in violation of Section 8(e) of the NLRA. (See id. ¶¶ 23-32, 36-38)

The Union opposes Plaintiff's motion to amend, arguing that (1) Plaintiff has not demonstrated "good cause" for its untimely motion; and (2) Plaintiff's proposed amendment would be futile. (Def. Br. (Dkt. No. 68) at 11, 15)

## DISCUSSION

### I.    LEGAL STANDARD

District courts "ha[ve] broad discretion in determining whether to grant leave to amend." Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000). "[L]eave to amend should be freely granted when 'justice so requires.'" Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir.

.

13

1999) (quoting Fed. R. Civ. P. 15(a)); <u>Rachman Bag Co. v. Liberty Mut. Ins. Co.</u>, 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'" (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962))). "Where a scheduling order has been entered, [however,] the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" <u>Grochowski v. Phoenix Constr.</u>, 318 F.3d 80, 86 (2d Cir. 2003). "'[A] district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause.'" <u>Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.</u>, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (quoting <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 340 (2d Cir. 2000)).

### A. Rule 16(b) Standard

Where "'a scheduling order governs amendments to the complaint,' and a plaintiff wishes to amend after the deadline to do so has passed, the plaintiff must show good cause to modify the deadline under Rule 16." <u>BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC</u>, 859 F.3d 188, 195 (2d Cir. 2017) (quoting <u>Holmes v. Grubman</u>, 568 F.3d 329, 334 (2d Cir. 2009)).

In determining whether a movant has satisfied the "good cause" standard under Rule 16(b), "the primary consideration is whether the moving party can demonstrate diligence." <u>Kassner v. 2nd Avenue Delicatessen Inc.</u>, 496 F.3d 229, 244 (2d Cir. 2007); <u>Holmes</u>, 568 F.3d at 335 ("Whether good causes exists turns on the 'diligence of the moving party.'" (citations omitted)). "[T]he movant must show that the deadlines [could not] be reasonably met despite its

diligence." Williams v. Town of Hempstead, 2017 WL 4712219, at *4 (E.D.N.Y. Oct. 18, 2017).

"A party has not acted diligently where the proposed amendment to the pleading is based on

information 'that the party knew, or should have known,' in advance of the deadline sought to be

extended." Kontarines v. Mortg. Elec. Registration Sys., Inc., No. 15 Civ. 2206 (ARR), 2016

WL 3821310, at *3 (E.D.N.Y. July 12, 2016) (quoting Perfect Pearl Co., 889 F. Supp. 2d at 457;

see also Hyo Jung v. Chorus Music Studio, Inc., No. 13 Civ. 1494 (CM) (RLE), 2014 WL

4493795, at *2 (S.D.N.Y. Sept. 11, 2014) ("If a proposed amendment is based on 'information

that the party knew or should have known prior to the deadline, leave to amend is properly

denied.'" (quoting Soroof Trading Dev. Co. Ltd. v. GE Microgen, Inc., 283 F.R.D. 142, 147

(S.D.N.Y. 2012)).

"[Diligence] is not, however, the only consideration [in the "good cause"

analysis]. The district court, in the exercise of its discretion under Rule 16(b), also may consider

other relevant factors including, in particular, whether allowing the amendment of the pleading at

this stage of the litigation will prejudice defendants." Kassner, 496 F.3d at 244. "'In gauging

prejudice, [courts] consider, among other factors, whether an amendment would 'require the

opponent to expend significant additional resources to conduct discovery and prepare for trial' or

'significantly delay the resolution of the dispute.'"" Ouedraogo v. A-1 Int'l Courier Serv., Inc.,

No. 12 Civ. 5651 (AJN), 2013 WL 3466810, at *5 (S.D.N.Y. July 8, 2013) (quoting Ruotolo v.

City of New York, 514 F.3d 184, 192 (2d Cir. 2008)). A court is not required to reach the issue of

prejudice, however. See Otegbade v. New York City Admin. for Children Servs., No. 12 Civ.

6298 (KPF), 2015 WL 851631, at *4 (S.D.N.Y. Feb. 27, 2015) ("[T]he Court declines to reach

the issue of prejudice, as it has exercised its discretion to decide Plaintiff's application to amend

under the 'good cause' standard of Rule 16(b)."); see also Jackson v. Odenat, 9 F. Supp. 342,

369-70 (S.D.N.Y. 2014) (rejecting argument that court erred in denying request to amend the complaint based on movant's lack of diligence, and declining to consider prejudice).

## B. Rule 15(a) Standard

"If good cause supports modifying the court-ordered deadline to amend, the moving party must still comply with Fed. R. Civ. P. 15." Eberle v. Town of Southampton, 985 F. Supp. 2d 344, 346 (E.D.N.Y. 2013). Although Rule 15(a) provides that leave to amend generally should be "freely give[n] . . . when justice so requires," a court may properly deny leave to amend in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo, 514 F.3d at 191 (quoting Foman, 371 U.S. at 182).

"'Where it appears that granting leave to amend [would be futile or] is unlikely to be productive[,] . . . it is not an abuse of discretion to deny leave to amend.'" See Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) (quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)); Selvam v. Experian Info. Sols., Inc., No. 13 Civ. 6078 (DLI) (JO), 2015 WL 1034891, at *4 (E.D.N.Y. Mar. 10, 2015) (denying leave to amend after granting motion to dismiss because "[t]he [amended] complaint gives no indication that Plaintiff has a colorable claim . . . and Plaintiff has already had one opportunity to amend the complaint"); Murdaugh v. City of N.Y., No. 10 Civ. 7218(HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although . . . leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente, 310 F.3d at 258 (citation omitted).

16

"[Parties] opposing a motion to amend . . . bear[] the burden of establishing that an amendment would be futile." Bonsey v. Kates, No. 13 Civ. 2708 (RWS), 2013 WL 4494678, at *8 (S.D.N.Y. Aug. 21, 2013) (citing Blaskiewicz v. Cty. of Suffolk, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998)).

## II.    ANALYSIS

### A.    Whether Plaintiff Has Shown "Good Cause" For Amendment Under Rule 16(b)

Here, the essential facts related to Plaintiff's LMRA Section 303 claim have been known to Plaintiff since the outset of this litigation. Indeed, in multiple letters to the Court and in its briefs opposing Defendants' motion to dismiss, Plaintiff explained that the Union's proposed subcontracting clause was unlawful because "[p]ension and welfare benefits under the Charter-Local 3 Agreement are those provided by the [JIB] . . . [and t]he JIB provides such benefits only to companies that are signatories to collective bargaining agreements with Local 3." (May 2, 2017 Def. Ltr. (Dkt. No. 9) at 1-2 (emphasis in original); June 26, 2017 Def. Ltr. (Dkt. No. 23) at 1; Def. Br. in Opp. to Mot. to Dismiss (Dkt. No. 39) at 15) Plaintiff did not plead these facts in the Complaint, the Amended Complaint, the SAC, or the previously submitted proposed TAC. (See Cmplt. (Dkt. No. 1); Am. Cmplt. (Dkt. No. 16) ¶¶ 1-19, 45-50; SAC (Dkt. No. 27) ¶¶ 1-19, 57-62; Proposed TAC (Dkt. No. 44) at 8-34)

Because Plaintiff's current LMRA Section 303 claim "is based on information 'that [Plaintiff] knew, or should have known,' in advance of the deadline sought to be extended," Plaintiffs have not shown that they acted diligently as to this claim. Kontarines, 2016 WL 3821310, at *3; see also 246 Sears Rd. Realty Corp. v. Exxon Mobil Corp., No. 09 Civ. 889 (NGG) (JMA), 2012 WL 4174862, at *10 (E.D.N.Y. Sept. 18, 2012) (plaintiff did not

17

demonstrate "good cause" where factual basis for new claims was known to plaintiff before the expiration of the amendment deadline).

Plaintiff's lack of diligence does not end the inquiry, however. As the Second Circuit has explained, diligence "'is not . . . the only consideration" in the "good cause" analysis and a district court may, "in the exercise of its discretion under Rule 16(b), also . . . consider other relevant factors including, in particular, whether allowing amendment of the pleading at this stage of the litigation will prejudice defendants.'" PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc., 73 F. Supp. 3d 358, 376 (S.D.N.Y. 2014) (quoting Kassner, 496 F.3d at 244). Accordingly, "in appropriate circumstances, a district court has discretion to grant a motion to amend even where the moving party has not shown diligence in complying with a deadline for amendments in a Rule 16 scheduling order." Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc., 304 F.R.D. 170, 176 (S.D.N.Y. 2014); Coale v. Metro-N. R. Co., No. 08 Civ. 01307 (CSH), 2009 WL 4881077, at *3 (D. Conn. Dec. 11, 2009) (granting leave to amend where, inter alia, defendant identified no prejudice, despite plaintiff's failure to show diligence); cf. Ouedraogo, 2013 WL 3466810, at *4 ("Generally, . . . the purpose of Rule 16(b) is to provide district courts 'discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side.'").

Here, the Union has not offered evidence that granting leave to amend will cause it unfair prejudice. (See Def. Br. (Dkt. No. 69) at 11-15) Because discovery was at an early stage when the Court dismissed the SAC, the Union has not been forced to unnecessarily expend significant resources. See Ouedraogo, 2013 WL 3466810, at *5 (no prejudice "given that the case, though pending for some time, is still in the early stages of litigation and all discovery deadlines have been extended pending the Court's ruling on the motion"); Tommy Lee Handbags

Mfg. Ltd. v. 1948 Corp., No. 12 Civ. 3638 (ALC) (DCF), 2012 WL 4903177, at *2 (S.D.N.Y. Oct. 12, 2012) (same). Moreover, the new factual allegations regarding, for example, the JIB's administration of pension and medical benefits, have been known to the Union since the outset of this litigation, so there is no risk of unfair surprise.

Given the lack of unfair prejudice to the Union, this Court will exercise its broad discretion under Rule 16(b) to consider the proposed TAC on the merits.

## B.      Whether Amendment Would Be Futile

### 1.      Applicable Law

Section 303 of the LMRA prohibits any labor organization from engaging in conduct defined as an unfair labor practice in Section 8(b)(4) of the NLRA. See 29 U.S.C. § 187(a). Section 8(b)(4)(ii)(A) of the NLRA, in turn, makes it an unfair labor practice for a labor organization to "threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by . . . subsection (e)." 29 U.S.C. § 158(b)(4)(A); see also Blyer v. Pratt Towers, Inc., 124 F. Supp. 2d 136, 144 (E.D.N.Y. 2000) ("A strike by a union to compel an employer to agree to a provision that would violate section 8(e) constitutes a violation by the union of section 8(b)(4)(ii)(A).").

Section 8(e) of the NLRA provides that

[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person. . . .

19

29 U.S.C. § 158(e).[5]

"[T]he purpose of Section 8(e) is to prohibit agreements that concern a secondary, as opposed to a primary or contracting employer." Blyer v. Staten Island Cable LLC., 261 F. Supp. 2d 168, 171 (E.D.N.Y. 2003). Accordingly, "[l]iability under section 8(e) turns in large part on whether an agreement is characterized as 'primary' or 'secondary' in nature." Local 210, Laborers' Int'l Union of N. Am. v. Labor Relations Div. Associated Gen. Contractors of Am., N.Y.S. Chapter, Inc., 844 F.2d 69, 73 (2d Cir. 1988) (citations omitted).

"An agreement has primary objectives, and thus is outside the ban of section 8(e), if it is intended to preserve work traditionally performed by a union for a particular employer," id., or to "restrict subcontracting to those who observe certain pay scales and conditions of employment." Berman Enterprises Inc. v. Local 333, United Marine Div., Int'l Longshoremen's Ass'n, 644 F.2d 930, 938 (2d Cir. 1981) (quoting N.L.R.B. v. Nat'l Mar. Union of Am., AFL-CIO, 486 F.2d 907, 912 (2d Cir. 1973) ("Union standards" clauses, "which restrict subcontracting to those who observe certain pay scales and conditions of employment, are valid.")).

So-called "union standards" or "work preservation" clauses are lawful, because

"[a] union has a legitimate interest in preventing the undermining of the work opportunities and standards of employees in a contractual bargaining unit by subcontractors who do not meet the prevailing wage scales and employee benefits covered by the contract. Thus, its contract with an employer may require the employer, if it subcontracts, to subcontract to another employer who agrees to observe 'the equivalent of union wages, hours, and the like' provided for in the bargaining agreement."

---

[5] "Contracts that violate § 8(e) of the Act are commonly referred to as 'hot cargo agreements,'" because such agreements require an employer to "cease[] handling or otherwise dealing with the products of other employers" – thereby rendering the goods "too hot to handle." R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, I.L.G.W.U., AFL-CIO, 33 F.3d 145, 151 (2d Cir. 1994).

Eisenmann Corp. v. Sheet Metal Workers Int'l Ass'n Local No. 24, AFL-CIO, 323 F.3d 375, 378,

383-84 (6th Cir. 2003) (quoting Gen. Teamsters Local 386, 198 NLRB 1038 (1972)); see also

International Brotherhood of Teamsters, Local 673 (RW Dunteman Company), N.L.R.B. Advice

Mem., 2010 WL 6777875 (Nov. 2, 2010) (subcontracting provision requiring primary employer

to subcontract work only to contractors who agree "that the persons performing such work will

work in accordance with the schedule of hours and will receive not less than the wages and

economic benefits provided in this agreement including holidays, vacations, premiums, overtime,

health and welfare and pension contributions, or benefits of their equivalent and any other

programs or contributions required by this Agreement" was valid "union standards" clause).

"Contractual provisions designed to retain work traditionally performed by bargaining unit

employees or intended to reduce a signatory employer's incentive to transfer work to non-union

labor are considered primary[,] because they are directed at a union's employer and are not

measures tactically taken to expand union objectives outside the primary employer-employee

relationship." Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO, No. 97

Civ. 1257 (JFK), 1997 WL 795766, at *5 (S.D.N.Y. Dec. 29, 1997)

Conversely, if "an agreement is designed to 'influenc[e] the labor relations

policies of [third] parties' by prohibiting dealings with those parties, it then has secondary goals

and it is barred by section 8(e)." Local 210, 844 F.2d at 73 (quoting Donald Schriver, Inc. v.

N.L.R.B., 635 F.2d 859, 868 (D.C. Cir. 1980)). Accordingly, "[c]ontract clauses that dictate the

labor policies of non-signatories" by limiting subcontracting to companies who have contracts

with the union are unlawful union signatory clauses. Blyer, 261 F. Supp. 2d at 172 (provision

limiting subcontracting work to "companies having agreements with [Local 3] similar to this

agreement" was unlawful union signatory clause, because it "prohibits Time Warner from

21

subcontracting work to any company that does not have contracts with Local 3" and, thereby, "seeks to regulate the labor policies of entities . . . which are not parties to the CBA" (emphasis added)). Similarly, while union standards clauses requiring subcontractors to "observe the equivalent of union wages, hours, etc." are valid, provisions that go beyond this and dictate the "precise allocation of such [a] package[]" by requiring the subcontractor to establish the benefit plan contained in the CBA, have an unlawful secondary effect. See Painters Orange Belt Dist. Council 48 (Painting Contractors), 277 NLRB 1470, 1475 (1986); Heavy, Highway, Bldg. & Const. Teamsters, 227 NLRB 269, 273 (1976) (provision requiring subcontractor to establish a health benefit plan providing that "'[i]n no event may cash payments be made to the person performing the work in lieu of a bona fide Health and Welfare Plan as herein provided'" was unlawful because "it, in effect, provides that equivalent costs are not sufficient but requires that a health and welfare plan providing a specific level of benefits be set up"). Such provisions are unlawful because they do not merely seek to preserve work for union employees by reducing a signatory employer's incentive to transfer work to non-union labor, but instead seek to dictate the labor policies of the subcontractor. See Heavy, Highway, Bldg., 227 NLRB at 273.

　　　　In sum, "'[i]f the object of the agreement is to benefit the employees of the bargaining unit represented by the union, it is 'primary' and in such event does not fall within the proscription of § 8(e), whereas if the object is the application of pressure on an outside employer in order to require him to accede to union objectives[,] it is 'secondary' and within the prohibition of § 8(e).'" Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO, 192 F.3d 250, 256 (2d Cir. 1999) (quoting A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772, 776 (3d Cir. 1967)). "The touchstone is whether the agreement or its maintenance is addressed to the

labor relations of the contracting employer vis-a-vis his own employees." Nat'l Woodwork

Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 645 (1967).

### 2. **Analysis**

Here, the Union had previously entered into a CBA with Plaintiff that contained

the following subcontracting provision:

SECTION 7 - SUBCONTRACTING AND CONTRACTING OUT WORK

A. The Company shall have the right to enter into sub-contracts of the work referred to in Section 6 of this Agreement with companies paying wages and benefits similar to this Agreement and providing such sub-contracting is not done for the purpose of laying off employees.

(TAC (Dkt. No. 66-1) ¶ 15 (emphasis added))

As discussed above, on March 26, 2017 – during collective bargaining

negotiations concerning a new CBA – the Union proposed that this language be amended to

provide for "wages and benefits identical to this Agreement," rather than "similar to this

Agreement." (Id. ¶¶ 16-17)

Plaintiff argues that the proposed TAC states a claim under LMRA Section 303

because (1) the Union's demand for "identical" benefits – which can only be provided by the JIB

– is "unlawful on its face"; and (2) even if it were ambiguous, extrinsic evidence demonstrates

that the Union intended for the clause to operate as an "unlawful union signatory" provision.

(Pltf. Reply (Dkt. No. 69) at 12-13; Pltf. Br. (Dkt. No. 67) at 9-10) The Union contends that

Plaintiff's proposed amendment would be futile, because the subcontracting proposal merely

sought "the equivalent of union wages, hours," and benefits, and is therefore a facially lawful

"union standards" work preservation clause. (Def. Br. (Dkt. No. 68) at 15-17, 20)

In construing a provision to determine whether it violates Section 8(e), the Second

Circuit has instructed courts to follow the NLRB's rules of construction. See R.M. Perlman, Inc.

23

v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, I.L.G.W.U.,

AFL-CIO, 33 F.3d 145, 155 (2d Cir. 1994). Under the NLRB's approach,

> [w]here the plain meaning of the clause indicates it is not clearly unlawful, it is to be read as requiring no more than the law allows. On the other hand, where a clause is ambiguous, unlawfulness will not be presumed; instead, extrinsic evidence will be examined to decide whether it was intended to be administered in a primary or lawful manner or in a secondary or unlawful fashion.

Id. (citing General Teamsters, Chauffeurs, Warehouseman and Helpers, Local 982 (J.K. Barker

Trucking Co.), 181 NLRB 515, 517 (1970)); see also Liquid Carbonic Corp., 277 NLRB 851

(1985) ("'[W]here the clause is not clearly unlawful on its face, the Board will interpret it to

require no more than what is allowed by law.'" (quoting General Teamsters, Local 982, 181

NLRB at 517)).

      Applying these rules of construction, courts and the NLRB have found

subcontracting provisions to have unlawful secondary effects only where they explicitly seek to

have a subcontractor assume the primary employer's responsibilities under the CBA or adhere to

the terms of a CBA. See, e.g, Ley v. Rochester Reg'l Joint Bd., Local 14A, 59 F. Supp. 3d 565,

569 (W.D.N.Y. 2014) (provision requiring subcontractor to deliver to union "a binding written

commitment by the [subcontractor] to assume all of the Company's obligations under th[e]

[CBA]" is an invalid union signatory clause); Painters Orange Belt Dist. Council 48 (Painting

Contractors), 277 NLRB at 1471-72, 1475 (provision stating that the "subcontractor shall be

responsible for the payment of all wages and fringe benefits provided under [the CBA]," and

that, in the event the "subcontractor fails to pay the wages or fringe benefits provided under [the

CBA], employer shall become liable" had unlawful secondary effects, because it unambiguously

required the subcontractor to provide the benefits required under the CBA and thereby sought to

dictate the labor policies of non-signatories); Heavy, Highway, Bldg., 227 NLRB at 273

(provision requiring the subcontractor to establish a benefits plan stating that "[i]n no event may cash payments be made to the person performing the work in lieu of a bona fide Health and Welfare Plan as herein provided" had unlawful secondary effects, because it made clear "that equivalent costs are not sufficient but . . . that a health and welfare plan providing a specific level of benefits be set up[;] [i]n so doing, that section does not seek to preserve work for unit employees but rather seeks to dictate the type of benefits payable to the subcontractor's employees"); Constr. & Gen. Laborers Union, Local 185, 255 NLRB 53, 58-59 (1981) (provisions that limit subcontracting to subcontractors who agree "to be bound by and comply with the terms and provisions of th[e] [CBA,]" and require the subcontractor "to establish and make contributions to jointly administered health and welfare and pension funds" are union signatory clauses within the meaning of Section 8(e)"). In all of these cases, the contractual language at issue made clear that the union was not simply seeking an equivalent economic package, but was instead seeking to have the subcontractor comply all the terms of a CBA.

By contrast, where subcontracting provisions do not contain such express language, they are uniformly upheld as facially valid "union standards" work preservation clauses. See, e.g., Eisenmann, 323 F.3d at 378 (6th Cir. 2003) (provision limited subcontracting to employers "'who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under the provisions of' the [CBA]"; held that this provision is a valid union standards clause that required the primary employer to subcontract with companies whose workers "enjoy the same or greater wages and benefits as the employees of the primary employer"); Meat & Highway Drivers, Dockmen, Helpers & Misc. Truck Terminal Emp., Local Union No. 710, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. N. L. R. B., 335 F.2d 709, 715-716 n. 15 (D.C. Cir. 1964) (provision

limiting subcontracting to companies whose workers "enjoy the same or greater wages and other benefits as provided in this agreement" merely required that the "total cost to the employer be the same or greater," and was a valid union standards clause); Laborers' Pension Fund v. Nat'l Wrecking Co., No. 90 C 5499, 1994 WL 513589, at *3-4 (N.D. Ill. Sept. 16, 1994) (noting that provision limiting subcontracting to employers "that observe the same wages, and comparable health and welfare and pension benefits" was a union standards clause); Gen. Teamsters Local 386 (Construction Materials Trucking, Inc.), 198 NLRB 1038, 1038 (1972) (subcontracting provision providing that "an employer . . . may subcontract . . . only to another employer who agrees that his employees will work 'in accordance with the schedule of hours and will receive not less than the wages and economic benefits' provided for in the contract, 'including holidays, vacations, premiums, overtime, health and welfare and pension contributions or benefits or their equivalent and any other programs or contributions required by this Agreement'" is an unambiguous, facially lawful, union standards clause); Teamsters Local 631 (Wesley Corp.), N.L.R.B. General Counsel Memorandum, Case 28-CE-61, 2007 WL 4233198, at *1-2 (Mar. 19, 2007) (contract language that limits the subcontracting of off-site work to subcontractors that pay "the same aggregate of wages and fringe benefits as [e]mployees covered under [the CBA]" is a "facially valid union standards provision" that merely "prohibits the [e]mployer from subcontracting to an employer that does not pay the prevailing wage"); Sealift, Inc. (National Maritime Union), 16 NLRB Advice Mem. Rep. 26132, 1989 WL 1705924, (Aug. 1, 1989) (provision requiring subcontractor to "provide such engineers with wages, pension benefits, and other economic benefits and conditions (such as health and medical benefits, overtime and premium pay, etc.) at least equal to that which would have been enjoyed had such engineers continued employment on the vessel by [the primary employer]" was valid union standards

26

clause; "Where a clause is not clearly unlawful on its face, the Board will interpret it to require no more than what is allowed by law. Thus, the maintenance of benefits language . . . can reasonably be interpreted to require payments of existing economic terms and conditions of employment for the life of the vessel."); cf. Tri-State Bldg. & Const. Trades Council, 262 NLRB 672, 673-74 (1982) (provision limiting subcontracting to employers who "observe the same wages, fringe benefits, hours, and conditions of employment as enjoyed by . . . employees" working pursuant to CBAs was unlawful, because the "conditions of employment" language unambiguously extended to "noneconomic provisions" of the CBAs, requiring the "subcontractor to adhere to working conditions unrelated to economic benefits").

Here, the subcontracting proposal at issue contains no explicit language requiring subcontractors to assume the primary employer's responsibilities under the CBA, or to abide by the non-economic terms of the CBA. Accordingly, the subcontracting proposal is not "clearly unlawful on its face." See General Teamsters, Local 982, 181 NLRB at 517. While Plaintiff highlights the Union's demand that subcontracting be limited "to companies paying wages and benefits identical to [the CBA]" (see Pltf. Br. (Dkt. No. 67) at 8-10) – as set forth above – both courts and the NLRB have approved clauses requiring employers to select subcontractors that pay "the same" wages and benefits. "Identical" is a synonym for "the same." See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1993) ("same" defined as "identical," and providing that "same" and "identical" are synonyms). Moreover, pursuant to the NLRB's rules of construction for clauses that are "not clearly unlawful," courts and the NLRB interpret such language as requiring the employer to use subcontractors that provide an economic package equivalent to the wages and benefits provided in a CBA. See, e.g., Eisenmann, 323 F.3d at 378; Meat & Highway Drivers, 335 F.2d at 715-716 n. 15.

Finally, Plaintiff has cited no law suggesting that the proposal at issue is unlawful. To the contrary, in all of the cases cited by Plaintiff, the language at issue limited subcontracting to subcontractors who were signatories to CBAs. (See Pltf. Reply (Dkt. No. 69) at 10-12 (citing Blyer, 261 F. Supp. 2d at 172 (provision limiting subcontracting work to "companies having agreements with [Local 3] similar to this agreement" was unlawful union signatory clause, because it "prohibits Time Warner from subcontracting work to any company that does not have contracts with Local 3"); Orange Belt Dist. Council of Painters No. 48 (Maloney Specialties), 276 NLRB 1372, 1373, 1387 (1985) (provision limiting subcontracting to subcontractors who are "properly licensed and signatory to this [CBA]" was invalid, because it "does not limit subcontracting broadly to firms which . . . pay their employees wages and fringe benefits which equal those defined within the economic provisions of Respondent Union's contract; rather the provision would confine subcontracting, more narrowly, to contract signatory firms. The contract language, therefore, constitutes neither a valid work-preservation clause, nor a valid union-standards requirement."); Painters Orange Belt Dist. Council 48 (Painting Contractors), 277 NLRB at 1471-72, 1475 (same)).

\*     \*     \*     \*

It is well-established that a union has a legitimate interest "'in preventing the undermining of the work opportunities and standards of employees in a contractual bargaining unit by subcontractors who do not meet the prevailing wage scales and employee benefits covered by the contract.'" Eisenmann, 323 F.3d at 383 (quoting Gen. Teamsters Local 386, 198 NLRB at 1038)). This Court concludes that the proposed subcontracting provision at issue here

constitutes a facially lawful "union standards" work preservation clause.[6] Because the proposed amendment would be futile, Plaintiff's motion for leave to file a Third Amended Complaint will be denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for leave to file a Third Amended Complaint is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 66), and to close this case.

Dated: New York, New York
September 18, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[6] Because the Union's subcontracting proposal constitutes a facially lawful "union standards" work preservation clause, resort to extrinsic evidence is not appropriate. See General Teamsters, Local 982, 181 NLRB at 517.